UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
TU YING CHEN,

                                Plaintiffs,

                v.

SUFFOLK COUNTY COMMUNITY COLLEGE,
And COUNTY OF SUFFOLK, NEW YORK,

                           Defendants.
-----------------------------------------------------------------------X

<u>For Online Publication Only</u>

**<u>MEMORANDUM & ORDER</u>**
14-cv-1597 (JMA) (SIL)

**APPEARANCES:**

Frederick R. Dettmer
89 Clinton Avenue, # 35
New Rochelle, NY 10801
     *Attorney for Plaintiff*

Dennis M. Brown, Suffolk County Attorney
By: Drew W. Schirmer, Assistant County Attorney
H. Lee Dennison Building
P.O. Box 6100
100 Veterans Memorial Highway
Hauppauge, NY 11788
     *Attorney for Defendants*

**AZRACK, United States District Judge:**

      Plaintiff Tu Ying Chen is a professor of chemistry at Suffolk County Community College, (the "College"). In March 2012, plaintiff was suspended for 30 days without pay. Plaintiff alleges that this suspension constituted unlawful discrimination on the basis of her age, gender, and national origin in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 626, and Title VII of the Civil Rights Act of 1964 ("Tile VII"), 42 U.S.C. § 2000e-5(f). In 2013 and 2014, plaintiff was subjected to two classroom observations, which plaintiff claims were in retaliation for a discrimination charge that she filed in November 2012. Plaintiff asserts that this alleged retaliation violated both the ADEA and Title VII.

Defendants, the College and Suffolk County, have moved for summary judgment on all of plaintiff's claims.  For the reasons stated below, defendants' motion is granted.

## I.  BACKGROUND

Plaintiff Tu Ying Chen is a woman who was born in China in 1943.  (Def. 56.1 ¶ 1, ECF No. 37-29.)  Plaintiff commenced employment with Suffolk County Community College, (the "College"), as an instructor in chemistry in 1967.  (Id. ¶ 2.)  In 1972, plaintiff was promoted to the position of Associate Professor.  (Id. ¶ 3.)

As explained below, four individuals at the College—Professor Thomas Breeden, Professor Jing Yi Chin, Jeffrey Tempera, and Ellen Shuler Mauk—play important roles in the events underlying plaintiff's claims.

Since the mid-1990's, the Physical Science Department (the "Department"), which includes chemistry, has been chaired by Breeden, a 63 year-old Caucasian professor of physics.  (Id. ¶ 5; Breeden Aff. ¶ 1, ECF No. 37-2; Breeden Dep. 35, Pl. Ex. A, ECF No.37-34.)[1]  Since 2003, Chin, a 58 year-old chemistry professor of Taiwanese origin, has served as the Assistant Academic Chair of the Department.  (Def. 56.1 ¶ 6; Chin Aff. ¶ 1, ECF No. 37-2; Pl. Mem. at 6.)  Tempera has served as the College's Assistant Vice President of Employee Resources since July 2011.  (Tempera Dep. 6, Pl. Ex. A.)  Prior to taking that post, he served as the Director of Labor Relations for Suffolk County.  (Mauk Dep. 11, Pl. Ex. A.)  Mauk was the President of the Faculty Association (the "FA" or the "union") from 1979 until August 2013.  (Id. at 7.)

## A.  2010 Disciplinary Proceeding and Stipulation

In September 2010, the College brought a disciplinary proceeding against plaintiff.  (Def. Exs. F, G, H; Breeden Aff. ¶ 7.)  The disciplinary charges were brought after Breeden reported to

---

[1]  For ease of reference, any exhibit attached to the Affirmation of Frederick R. Dettmer, ECF No. 37-32, is referred to as a "Pl. Ex."  Similarly, any exhibit attached to the Declaration of Drew W. Schirmer, ECF No. 37-1, is referred to as a "Def. Ex."

the Executive Dean's Office in April 2010 that plaintiff had neglected various duties in violation of the College's rules and regulations and the CBA between the College and its faculty.  (Def. Exs. F, G, H; Breeden Aff. ¶¶ 6–8.)  Plaintiff denies that the she committed the alleged violations.  (Chen Decl. ¶ 8, ECF No. 37-33)

In September 2010, the College notified plaintiff that she would be terminated in October 2010 for these violations.  (Breeden Aff. ¶ 8; Def. Ex. G.)  In October 2010, the FA filed a grievance challenging the College's attempt to terminated plaintiff.  (Def. Ex. H ¶ 10; Breeden Aff. ¶ 9; Mauk Dep. 11–17.)

In December 2010, plaintiff and the College resolved the disciplinary proceeding by entering into a stipulation (the "December 2010 Stipulation").  (Def. Ex. H.)  Pursuant to this Stipulation, plaintiff was not terminated.  (Id.)  However, the December 2010 Stipulation imposed various obligations on plaintiff and permitted the College to discipline plaintiff if she violated any terms of the stipulation or any rules, regulations, or procedures of the College.  (Id.)  For a first violation, the College could suspend plaintiff for 30 days without pay.  (Id. ¶ 4.)  For a second violation, the College could suspend plaintiff for 60 days without pay.  (Id.)  For a third violation, the College could immediately terminate plaintiff.  (Id.)

**B.  The Spring 2012 Semester**

During the Fall Semester of 2011, the faculty who teach chemistry held a meeting to choose their schedules for the upcoming Spring 2012 semester, and picked their courses using a round-robin selection process.  (Def. 56.1 ¶ 12; Chin Dep. 39–41, Pl. Ex. A; Chin Aff. ¶¶ 6–7.)  During the meeting, plaintiff, who is the most senior tenured professor in the department, chose to teach two classes with accompanying labs—CHE134-101 and CHE 100-119.  (Chen Tr. 60–62, Def. Ex. E, ECF No. 37-7.)  CHE134-101 had lecture and lab on Tuesday and Thursday and

CHE100-119 had lecture and lab on Monday and Wednesday.  (Id.)

On January 10, 2012, Chin sent plaintiff an email informing her that the CHE134 class plaintiff had selected was cancelled due to low enrollment.  (Def. Ex. I.)  In the email, Chin directed plaintiff to select replacement classes by January 17, 2012, so that plaintiff would have a full 15-credit schedule.[2]  (Id.)

Between January 12, 2012, and January 23, 2012, plaintiff, Chin, and others discussed potential replacement classes for plaintiff for the Spring 2012 semester, exchanging numerous emails on this topic.  As discussed more fully infra in the discussion section of this opinion, Chin rejected two of plaintiff's schedule proposals during this process.  Plaintiff maintains that Chin's rejection of plaintiff's requests violated the College's policies.

Then, on Monday January 23, 2012, at 10:03 AM, plaintiff emailed Breeden, stating: "I'll conduct Tue's 8 am lab; can't be here in the afternoon.  I can take both Tues & Thur morning labs if that is better for the department."  (Def. Ex. J.)

About an hour later, Breeden responded to plaintiff's email, stating:  "Thank you for your offer, but[,] on Friday, Dr. Chin completed finding teachers, for all classes, so your Spring 2012 teaching schedule will remain exactly as last assigned by Dr. Chin."  (Pl. Ex. I.)  The record does not clearly indicate what classes were on the "schedule . . . last assigned by Dr. Chin."

The next morning, Tuesday January 24, plaintiff did not show up to teach a lab at 8 AM, which the College maintains plaintiff was required to teach.  (Pl. 56.1 at 5.)  Plaintiff asserts that she was not aware that she was supposed to teach this class.  Plaintiff insists that she offered to

---

[2]  Professors are required to teach 60 credits every four semesters.  (Chin Dep. 41.)  However, they can choose to teach less than 15 credits in one semester, provided that they make up the missing credits in another semester.  For example, a professor could teach a "light load" of 14 credits in the fall semester and then a "heavy load" of 16 credits in the spring semester.  (Id. at 41–45.)  Also, a professor may choose to teach an "overload" course, which occurs when a professor has less than 15 credits in one semester and decides to accept adjunct pay for teaching the additional "overload" course rather than using the additional course to lighten the professor's teaching load in a subsequent semester.  (Id. at Dep. 41–43.)

4

teach this class, but that Breeden rejected her offer in his January 23 email.

Later that morning, Breeden emailed plaintiff, stating that plaintiff was not present for the 8 AM lab and that he was not sure how to charge plaintiff's accrued time because she was not sick. (Pl. Ex. I.) An hour later, Breeden emailed plaintiff again and informed her that she would lose half of a personal day for missing the lab. (Pl. Ex. J.)

On January 24, 2012, at 12:45 PM, Mauk emailed Chin, plaintiff, and Breeden. (Pl. Ex. G.) In this e-mail, Mauk recounts the conversation that she had with plaintiff on Monday afternoon. Mauk's email states:

> The purposes of this email is to indicate in writing the request made to me by [plaintiff] yesterday afternoon for light-loaded schedule of 12 contact hours this semester. She requested to teach chemistry labs on Tuesday and Thursday mornings at 8 a.m. in addition to her lecture and lab assignments on Monday and Wednesday.

(Id.) Mauk's email also stated: "It is my understanding from our conversation that [plaintiff] had already been assigned the a.m. lab on Tuesday per her request on 1/12/12. She will need the Thursday morning lab in order to have a 12 contact hour load for this semester." (Id. (emphasis added).)

On Wednesday January 25, 2012, at 12:09 PM, Chin emailed plaintiff a finalized schedule with a total of 12 credit hours. (Dec. Ex. K.) Chen's final schedule consisted of: CHE100-199 (with class on Monday and Wednesday morning and lab on Monday afternoon); CHE100-106 (a lab on Tuesday morning at 8 AM); and CHE100-107 (a lab on Thursday morning at 8 AM). (Id.)

The next morning, Thursday January 26, 2012, plaintiff did not show up for her scheduled 8 AM lab. (Pl. 56.1 at 5; Def. Ex. L.) Plaintiff insists that she did not know that she had been scheduled to teach the Thursday morning lab. (Chen Decl. ¶ 3.) Plaintiff maintains

5

that her schedule was not fixed until Chin's January 25, 2012 e-mail finalized her schedule and that she did not learn about this email until she returned to campus on Thursday January 26, 2012, after 10 AM. (Id.)

On January 26 at 12:15 PM, Breeden sent an email to Tempera informing him that plaintiff had missed her Tuesday and Thursday morning labs. (Def. Ex. L.) Breeden asked Tempera how plaintiff's accrued time should be charged because she was not sick and could not use a personal day because she had failed to provide the College prior notice of her absence. (Id.) Breeden's email stressed that "[t]his insubordination must stop, immediately!" (Id.) Breeden's email to Tempera also included Mauk's earlier email from January 24 in which Mauk recounted her Monday afternoon conversation with plaintiff. (Id.)

On January 27, 2012, Breeden sent an email informing plaintiff that, because she missed the two labs without any notice to the College, he was entitled to suspend her for 30 days without pay under the December 2010 Stipulation. (Def. Ex. M.) However, rather than immediately suspending plaintiff, Breeden warned her: "[if] you miss ANY class, for the remainder of Spring 2012, without properly notifying me, I will dock you 30 days pay, on the next violation, of any kind, of the [December 2010 Stipulation]." (Id.) Breeden also sent plaintiff a formal letter to the same effect. (Id.)

On January 30, 2012, Breeden emailed plaintiff, Tempera, and Mauk, threatening to suspend plaintiff if she failed to post her office hours or failed to show up for her lab scheduled for the next day. (Pl. Ex. K.) Plaintiff ended up teaching that lab, and did not miss any further classes that she was scheduled to teach during the Spring 2012 semester. (Chen Decl. ¶ 4.) It also appears that plaintiff ultimately posted her office hours in accordance with Breeden's directive.

6

On February 1, 2012, Mauk emailed plaintiff to inform her that Tempera had decided that, if plaintiff abided by the terms of Breeden's January 27 email, then plaintiff would be permitted to use a personal day for her absence on January 24, 2012, and a sick day for her absence on January 26, 2012. (Def. Ex. N.) On February 8, plaintiff submitted a leave report to Breeden; however, she did not designate sick or personal time for either of her absences.[4] (Pl. 56. 1 at 5; Def. Ex. N.) Later that day, Breeden directed plaintiff to file a corrected leave report in compliance with Mauk's email. (Def. Ex. N.)

On February 21, 2012, and February 24, 2012, Tempera emailed plaintiff and informed her that unless she agreed to the terms set forth in Mauk's February 1 email, she would be suspended for 30 days. (Def. Ex. O.) Tempera explained that unless plaintiff accepted this "settlement offer," the College would consider her absences on January 24 and January 26 to be unauthorized. (Id.) Plaintiff never accepted this offer and never submitted a leave report designating leave time for January 24, 2012 and January 26, 2012. (Def. Ex. P; Chen Decl. ¶ 5.) Plaintiff maintains that she was not sick either day and did not wish to use her personal leave. (Chen Decl. ¶ 5.) Plaintiff believes that complying with the College's request would have required her to falsify her leave report. (Id.)

On March 1, 2012, Tempera informed plaintiff that she would be suspended for 30 days without pay, explaining that:

> you have failed to comply with my directive contained in the notification I sent you on Friday, February 24, 2012 with regards to your absences on January 24, 2012 and January 26, 2012. Specifically, you failed to accept the terms of the settlement offer contained in my February 21, 2012 notification by 5:00 p.m. on Monday February 27, 2012 and as such the College considers your absences on January 24, 2012 and January 26, 2012 to be unauthorized. Further, your failure to comply is a violation of the December 16, 2010 Stipulation and Agreement you agreed to.

---

[4] Plaintiff's leave report for January was due on February 8, 2012. (Def. Ex. H ¶ 1; Def. Ex. N.) The December 2010 Stipulation explicitly required plaintiff to file timely leave reports. (Def. Ex. H ¶ 1.)

(Ex. P.)  He also told her that she would not be paid for January 24 and January 26.  (Id.)

## C.  The October 2012 Observation and Plaintiff's Discrimination Charge

On October 16, 2012, Chin and Breeden observed one of plaintiff's classes after receiving complaints from a number of plaintiff's students.  (Def. Ex. T; Chin Aff. ¶ 23; Breeden Aff. ¶¶ 25–26.)

On November 19, 2012, plaintiff filed a charge with the New York State Division of Human Rights, ("NYSDHR") alleging that the College discriminated against her by: (1) suspending her; (2) improperly denying her scheduling requests when she was selecting a replacement class; and (3) observing her in October 2012.  (Def. Ex. X.)  In May 2013, the NYSDHR issued a finding of probable cause that the College engaged in discrimination.  (Id.) The NYSDHR, however, subsequently reopened the investigation because the College was not given an adequate opportunity to respond to plaintiff's allegations.  (Id.)  In October 2013, the NYSDHR concluded that, upon further review, that there was no probable cause to believe that the College engaged in discrimination.  (Id.)

## D.  The Additional Observations of Plaintiff in 2013 and 2014

In April 2013, Breeden scheduled a classroom observation to investigate student complaints concerning plaintiff.  (Pl. Ex. O.)  It appears that this observation eventually occurred on May 1, 2013.  (Id.)  Apparently, as part of the observation process, students in the class were interviewed.  (Id.)  The FA later grieved this observation, arguing that the manner in which the student interviews were conducted was improper.  (Mauk Dep. 62–63.)

In February 27, 2014, plaintiff was subjected to another observation.  (Pl. Exs. P, Q.) The two professors who observed plaintiff issued evaluation reports that differed sharply in their assessment of plaintiff.  (Id.)

8

## II.  DISCUSSION

### A.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" "while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "When ruling on a summary judgment motion, [the court] must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

In a discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer . . . ."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  Because direct evidence of discriminatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  Id.  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

"[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

**B.  Standard for Age, Gender, and National Origin Discrimination**

When a plaintiff alleges discrimination based on indirect or circumstantial evidence, courts employ the "burden-shifting" framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under McDonnell Douglas, a plaintiff must first establish a prima facie case.  For a prima facie case of gender, national origin, or age discrimination under Title VII and the ADEA, a plaintiff must show that: (1) she is a member of a protected class or age group; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances creating an inference of discrimination.  Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 129 (2d Cir. 2012) (addressing ADEA claims); Leibowitz v. Cornell Univ., 584 F.3d 487, 498 & 498 n.1 (2d Cir. 2009) (addressing Title VII and  ADEA claims), superseded on other grounds, as recognized in, Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108–09 (2d Cir. 2013).  Plaintiff's burden, at the prima facie stage is "de minimis."  Zimmerman v. Assocs. First Capital Corp., 251 F .3d 376, 381 (2d Cir. 2001).  An inference of discrimination may be derived from a variety of circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's "invidious comments about others in the employee's protected group," "the more favorable treatment of employees not in the protected group[,] or the sequence of events leading to the plaintiff's discharge."  Abdu–Brisson, 239 F.3d at 468.

After the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for its action.

"The plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

A plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 256); see also Taylor v. Family Residences and Essential Enters., Inc., No. 03–CV–6122, 2008 WL 268801, at *8 (E.D.N.Y. Jan. 30, 2008) ("[A plaintiff] may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." (citations and internal quotation marks omitted)).

"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves, 530 U.S. at 147. Where a plaintiff offers evidence of pretext, courts must take a "case-by-case approach" and examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143). Whether summary judgment is appropriate depends on "a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves, 530 U.S. at 148–49. As the Court in Reeves noted, where "the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation," judgment as a matter of law may still be appropriate, where, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." Id. at 148.

The analysis for plaintiff's gender, national origin, and age discrimination claims is similar. The only difference is that, for plaintiff's gender and national origin discrimination claims, plaintiff must only prove that her gender and/or national origin was a motivating factor behind the adverse action, Weinstock v. Columbia Univ., 224 F.3d 33, 58 (2d Cir. 2000), whereas for plaintiff's age discrimination claim, she must prove that her age was a but-for cause of the adverse action, Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).[5]

**C.  Analysis of Plaintiff's Age, Gender, and National Origin Discrimination Claims**

Plaintiff concedes that the only adverse action she suffered was the 30-day suspension.

---

[5]  Here, plaintiff alleges that she was subject to "intersectional" discrimination because she was a 76-year old Chinese woman.  Neither party explicitly addresses what causation standard applies to "intersectional" discrimination claims that involve protected characteristics that are covered by different statutes and are subject to different causation standards.  It is ultimately unnecessary to resolve this question because even assuming that motivating factor causation applies to plaintiff's intersectional discrimination claim, plaintiff cannot meet that burden.

The Court assumes that plaintiff has established a prima facie case.

Defendant has offered non-discriminatory reasons for her suspension. Defendants assert that plaintiff was suspended due to her "repeated failure and refusal to comply with established rules and procedure of the College and the express terms of the FA Contract, as well as the [December 2010 Stipulation]." (Def. Mem. at 16.) Specifically, defendants assert that plaintiff was suspended because the College determined that plaintiff "failed to submit a completed leave report"—despite being "given numerous opportunities to do so"—"to account for her failure to appear for" the two classes that she missed without notifying the College. (Pl. Reply Mem. at 3 (citations omitted).)

The Court now turns to the question of whether, considering the entire record and viewing that evidence in the light most favorable to plaintiff, a reasonable jury could infer that plaintiff's suspension was discriminatory.

Plaintiff advances four arguments in an attempt to show that the College's reasons for suspending plaintiff were a pretext for discrimination. Plaintiff asserts that: (1) Breeden has made comments that evince age discrimination and a desire to terminate plaintiff for pretextual reasons; (2) plaintiff did not knowingly violate any directives to teach the two classes that she missed and acted appropriately in refusing to submit a falsified leave report; (3) the reasons given by the College for her suspension were shifting; and (4) Chin's rejection of plaintiff's proposed replacement classes and the College's decision to suspend plaintiff both involved procedural irregularities that suggest discrimination.

As explained below, none of plaintiff's arguments—whether considered in isolation or in the aggregate—are sufficient for a reasonable jury to infer that plaintiff's suspension was motivated by her age, gender, or national origin.

**1. Defendants' Argument that Plaintiff's Declaration Should Be Excluded**

Before addressing each of plaintiff's arguments, the Court must address a threshold evidentiary issue. A number of the critical facts underlying plaintiff's opposition to summary judgment are contained in a declaration, executed by plaintiff, that purports to be "in accordance with 28 U.S.C. § 1746." (Chen Decl. at 1.) Defendants, however, assert that this declaration should not be considered because it fails to comport with the requirements of 28 U.S.C. § 1746, which provides:

> [w]herever . . . any matter is required or permitted to be supported . . . by the sworn declaration . . . in writing of the person making the same . . . such matter may, with like force and effect, be supported . . . by the unsworn declaration . . . [of] such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form . . . . If executed within the United States . . . : "<u>I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct</u>. Executed on (date). (Signature)".

28 U.S.C. § 1746 (emphasis added).

Defendants correctly point out that plaintiff's declaration lacks this critical language and any reference to perjury. Plaintiff has not sought to submit an amended declaration in response to defendants' argument. Because plaintiff's declaration does not meet the requirements of § 1746, the Court concludes that it should be excluded from the record. Absent plaintiff's declaration, some of the arguments raised in plaintiff's opposition brief necessarily fail as they are dependent on factual assertions contained in plaintiff's declaration.

In any event, even if plaintiff's declaration were considered, plaintiff cannot, for the reasons set out below, survive summary judgment. Although it is appropriate to exclude plaintiff's declaration, the Court will, nevertheless, address all of plaintiff's arguments below under the assumption that plaintiff's declaration is properly included as part of the record.

14

### 2. Breeden's Comments

Plaintiff points to certain comments made by Breeden.  A reasonable jury could not infer from these comments that Breeden was motivated by plaintiff's protected characteristics or that the reasons proffered for her suspension were pretextual.

First, during the College's attempt to discipline plaintiff in 2010, Breeden sent an email stating:  "Termination is the appropriate discipline, but I suspect we can't win; however, perhaps the threat might convince her to retire.  She has been here over 40 years, completely miserable and alone, since the first day I was hired as an adjunct, over 30 years ago.  VERY sad."  (Pl. Ex. C.)   Plaintiff contends that this email suggests age discrimination because it mentions "retirement."[6]

Although references to retirement can, depending on the context, raise an inference of age discrimination, the sole reference to retirement here could not, given its context, be construed by a reasonable jury to suggest age discrimination.  Breeden clearly wished to terminate plaintiff, but, given the difficulty of terminating a long-tenured professor represented by a union, he expressed his hope that the mere threat of termination, along with plaintiff's unhappiness in her position, might make her voluntarily retire.  Nothing in Breeden's comment suggests age discrimination—a reasonable jury could not find to the contrary.

Second, in September 2010, Breeden sent another email stating that he would ask the College's security department to save surveillance tapes in order to show that plaintiff was not coming to work.  (Pl. Ex. E.)  In the email, Breeden remarks that if security "does this, and the

---

[6]  Defendants respond to this email and another email from 2010 by arguing that the general release that plaintiff signed in connection with the December 2010 Stipulation precludes plaintiff from relying, in the instant lawsuit, on any facts related to the 2010 disciplinary proceeding.  Defendants, however, point to no specific language in the release to support this argument.  The Court fails to see how the general release that plaintiff signed precludes her from relying on events that occurred in 2010 to support her current claims that she was discriminated against <u>after</u> signing the release.

[union] saves her job, we could still fire her for job abandonment, <u>a clause included</u> because [plaintiff] missed the first two weeks of class many years ago, and didn't bother to inform anyone." (Id. (emphasis added).) Plaintiff appears to interpret this email to mean that Breeden was willing to resurrect an incident from years ago as a pretextual justification for firing plaintiff. (Pl. Mem. at 19.) Plaintiff's interpretation is baseless. Breeden's email states that plaintiff could be fired for job abandonment, and then indicates that a job abandonment "clause" was "included" (presumably in the CBA) because of an incident involving plaintiff years ago. Breeden did not suggest that he would try to rely on this years-old incident to fire plaintiff. Plaintiff's interpretation of this email completely ignores the phrase "a clause included" in the email.[7]

Third, plaintiff contends that the following exchange from Breeden's deposition suggests discrimination.

Q: Is it fair to say, Mr. Breeden, that at least as far back as 2010 you were eager to have Professor Chen retire?

A: Eager? I am not sure what "eager" means.

Q: Let me try it another way. Is it fair to say that at least as of 2010 you would have been happy had Professor Chen just retire or resign?

A. During one of the periods when we were cordial Professor Chen said to me, Tom, I have wasted 30 years of my life here, and that's a tragedy. So, if someone is unhappy in their position I would not have been unhappy if she did something that makes her happier.

****

Q: In your view, Mr. Breeden, as of 2010 Professor Chen had just gotten too old to continue to teach at the college?

A: No, I wouldn't say that. Even if someone retires they can still come back and teach eight hours a semester. This semester in question she was only teaching 12

---

[7] At one point, plaintiff misquotes this passage in her brief and neglects to indicate (with an ellipsis or any other notation) that she has omitted this critical phrase from the quotation. (Pl. Mem. at 19.)

hours.  So, if teaching is important to you you go to the top of the seniority list among the adjuncts, so you give up your seniority among full-timers.  Just because you retire doesn't mean that you can't teach.  Lot's of people do that.  They retire, and then they'll teach a course or two because they enjoy the teaching. But you're freed from many of the burdens. You don't have to do assessments, you don't have to do curriculum reviews, all of those things that faculty hate to do are not required of adjuncts.

(Breeden Dep. 169–170.)

Contrary to plaintiff's argument, a jury could not infer any discriminatory animus (whether age-based or otherwise) from these comments.  Moreover, whatever the import of Breeden's vague and rambling answers, as explained below, a reasonable jury could not conclude from this record that the reasons for plaintiff's suspension were pretextual.

### 3.  Plaintiff's Excuses for Missing Two Classes and Not Submitting a Completed Leave Report

It is undisputed that plaintiff did not teach either the January 24, 2012 morning class or the January 26, 2012 morning class.  Plaintiff, however, maintains that she did not know that she was required to teach those classes.  Even if true, however, that fact does not suggest pretext.

The question of whether plaintiff was, in fact, aware that she was supposed to teach both of these classes is, in and of itself, not the issue in this case.  See McPherson v. New York City Dept. of Educ., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what 'motivated the employer,' . . . the factual validity of the underlying imputation against the employee is not at issue." (internal citation omitted)).  For example, when a plaintiff has been disciplined for misconduct, "the question is not whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination."  Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) (citations and internal quotation marks omitted). "Therefore, in the absence of

evidence undermining [the employer's] assertion that it believed in good faith that [the plaintiff's] conduct merited discipline . . . , or of any other evidence of pretext or discriminatory intent, [the employer] is entitled to summary judgment." Id. (citations omitted).

With respect to the class on Thursday January 26, the evidence against plaintiff is overwhelming. Around noon on Wednesday January 25, Chin emailed plaintiff and informed her that her finalized schedule included the Thursday morning class. Plaintiff, however, maintains that she did not learn about her finalized schedule until later on Thursday (when, presumably, plaintiff checked her email and saw Chin's email.)

Plaintiff's arguments about the Thursday class fail because, inter alia, there is no evidence suggesting that any decision-makers involved in plaintiff's suspension had any reason to believe that plaintiff was not aware that she was supposed to teach the class until late Thursday morning. There is also no evidence indicating that, after the missed class, but prior to the suspension, plaintiff ever informed any of the relevant parties about her purported reason for missing this class or the January 24 class.[8] More importantly, even assuming arguendo that plaintiff did relay her explanation about the January 26 class to the College prior to her suspension, plaintiff's story—that she never checked her email between noon on Wednesday and Thursday after 10 AM despite the semester starting and her schedule being in flux—is rather incredible and would give any administrator ample reason not to credit plaintiff's explanation or accept it as an excuse. Accordingly, a reasonable jury could not question the good faith of the College's determination that plaintiff's absence was unauthorized and, by extension, the College's implicit conclusion that plaintiff was at fault for her absence.

With respect to the missed class on Tuesday January 24, plaintiff asserts that on Monday

---

[8] Neither party addresses this issue. Instead, plaintiff stresses that the College never asked her why she missed this class or the class that she missed on January 24. (Chen Decl. ¶ 13.) Contrary to plaintiff's suggestion, that fact does not suggest pretext or raise an inference of discriminatory intent.

January 23, she offered to teach this class, but Breeden declined her offer.  To address plaintiff's arguments, it is necessary to recount the relevant email exchanges on January 23 and January 24.

To recap, on Monday January 23, 2012, at 10:03 AM, plaintiff emailed Breeden, stating: "I'll conduct Tue's 8 am lab; can't be here in the afternoon.  I can take both Tues & Thur morning labs if that is better for the department."  (Def. Ex. J.)  About an hour later, Breeden responded to plaintiff's email, stating:  "Thank you for your offer, but[,] on Friday, Dr. Chin completed finding teachers, for all classes, so your Spring 2012 teaching schedule will remain exactly as last assigned by Dr. Chin."  (Pl. Ex. I.)  It is not clear from the record what classes were on the "schedule . . . last assigned by Dr. Chin."

Plaintiff contends that, in this email, Breeden declined her offer to teach the Tuesday and Thursday morning classes.  (Pl. 56.1 at 8.)  This email exchange is, at best, ambiguous. Certainly, one reasonable interpretation of this exchange is that plaintiff informed Breeden that she will conduct the Tuesday lab, and then offered to teach both the Tuesday and Thursday labs if that was best for the department.  Under this interpretation, Breeden was only rejecting plaintiff's offer to also teach the Thursday lab.  In any event, even if a reasonable juror could construe this exchange as plaintiff suggests, this exchange is insufficient to establish pretext.  On Tuesday January 24, 2012, at 12:45 PM—after plaintiff had missed the morning class—Mauk sent an email to Chin, Breeden, and plaintiff.  (Pl. Ex. G.)  Mauk's email states:  "The purposes of this email is to indicate in writing the request made to me by [plaintiff] yesterday afternoon for light-loaded schedule of 12 contact hours this semester.  She requested to teach chemistry labs on Tuesday and Thursday mornings at 8 a.m. in addition to her lecture and lab assignments on Monday and Wednesday."  (Id.)  Crucially, Mauk also stated:  "It is my understanding from our conversation that [plaintiff] had already been assigned the a.m. lab on Tuesday per her

request on 1/12/12." (Id. (emphasis added).)  Thus, even if Breeden's January 23 email might have created some confusion, Mauk subsequently informed Breeden and Chin that it was Mauk's understanding, from Mauk's afternoon conversation with plaintiff, that plaintiff had already been assigned the Tuesday morning lab on January 12, 2012.  The conversation between Mauk and plaintiff discussed in Mauk's email occurred on Monday afternoon, after the potentially ambiguous email exchange between plaintiff and Breeden.  Thus, irrespective of any ambiguities in that email exchange, Mauk informed Breeden and Chin that Mauk believed that plaintiff knew, on Monday afternoon, that she was supposed to teach the Tuesday morning class on January 24.  In light of this information from Mauk, plaintiff cannot argue that the College seized upon the ambiguous email exchange with Breeden as a pretext to suspend her.  Given Mauk's account, there was ample evidence before the College indicating that plaintiff's January 24 absence was unauthorized because plaintiff knew—on Monday afternoon after Breeden's email—that she had been assigned the Tuesday morning lab.  Accordingly, contrary to plaintiff's suggestion, the College's implicit determination that plaintiff was at fault for this absence was neither baseless nor unreasonable.  It should also be noted that there is no evidence suggesting that Mauk, the source of this information, intended to discriminate against plaintiff or had any motive to lie to Breeden and Chin.  In fact, the union, of which Mauk was the President,  had previously defended plaintiff and saved her job in 2010.

Furthermore, as with plaintiff's excuse for missing the Thursday January 26 class, there is no evidence that, prior to her suspension, plaintiff ever told the College that she believed, based on Breeden's January 23 email, that she did not have to teach the morning lab on January 24.

Finally, it is important to stress that plaintiff was not immediately suspended for missing

these two classes. Instead, she was given the opportunity to use personal leave and sick leave time for the missed classes. Plaintiff was suspended only after she refused to do so. This sequence of events—in which the College initially gives plaintiff the benefit of the doubt about her missed classes—is proof that the College's reasons for the suspension were not pretextual. Even if Breeden's January 23 email might have caused confusion about whether plaintiff was supposed to teach the morning class on January 24, the College's decision to allow plaintiff to use leave time for this missed class—before taking more punitive actions—was a completely reasonable response to this situation.

The only party who appears to have acted unreasonably during this whole sequence of events is plaintiff, who stubbornly refused to agree to use any leave time for the missed class, apparently under the belief that she was completely free of any fault during the events at issue. (See Chen Decl. ¶ 5.) Similarly unreasonable was plaintiff's belief that submitting a leave report designating sick time for one of the two missed classes would have constituted a falsified report, given the College's explicit blessing of this arrangement.

Plaintiff also argues that her refusal to submit a "falsif[ied]" leave report designating personal and sick leave time for the two missed classes does not constitute a violation of the College's rules and procedures, as required by the December 2010 Stipulation. This argument is absurd. The College reasonably concluded that plaintiff's absences were not authorized. The College could have simply suspended plaintiff for those unauthorized absences. Instead, the College permitted plaintiff to use leave time, including one day of sick leave, even though plaintiff was not sick either of these days. Clearly, this offer was beneficial to plaintiff as the College could have simply required her to take two personal days for the missed classes. Of course, if plaintiff truly believed that it was inappropriate to use a sick day for her absences, she

21

could have filed a leave report designating personal leave for both absences. Instead, plaintiff submitted an incomplete leave report that did not select any type of the leave to account for her two absences. Clearly, plaintiff's failure to submit a complete leave report violated the December 2010 Stipulation.

For the reasons stated above, none of plaintiff's arguments suggest that the College's reasons for her suspension were pretextual.

### 4. Shifting Reasons for the Suspension

Inconsistencies in an employer's justifications for taking an action can raise an issue of fact with regard to the veracity of the proffered reasons. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (finding issue of fact where employer "expressly stated" to the EEOC that job performance was not a factor in plaintiff's termination and then later asserted plaintiff was "terminated in part because of poor performance"); E.E.O.C. v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (vacating grant of Rule 50 motion where defendant later abandoned the initial justification given to state investigators, which defendant had earlier termed the "sole reason" for plaintiff's discharge).

Plaintiff asserts that the reasons offered by the College for the suspension were shifting. This argument is not persuasive. The College's reasons were not shifting. Breeden initially told plaintiff that he could suspend her immediately for missing the two classes, but elected not do so. A few days later, plaintiff was told that she could designate leave for the two days she missed. The College would permit her to take one personal day and one sick day for the two days she missed. Plaintiff did not accept this offer and never submitted a completed leave report to account for her unauthorized absences. Tempera then suspended her because her absences were unauthorized and her "failure to comply" with the College's request for a leave report was a

22

violation of the December 2010 Stipulation.  Nothing about this sequence of events suggests that the College's reasons for the suspension were shifting or that Tempera's stated reasons were pretextual.

### 5.  Procedural Irregularities

Plaintiff asserts that various procedural irregularities occurred during the events leading up to plaintiff's suspension.  Specifically, plaintiff asserts that, when she tried to select a replacement class, the College violated plaintiff's contractual "bumping" rights, which are explained in detail below.  Additionally, plaintiff asserts that the College violated the terms of the December 2010 Stipulation because, inter alia, the President of the College was allegedly not involved in the decision to suspend her, as required by the stipulation.

"'[D]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision.'"  Weinstock, 224 F.3d at 45 (quoting Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997)); see also Desir v. Bd. of Co-op. Educ. Servs. (BOCES) Nassau Cty., 803 F. Supp. 2d 168, 177 (E.D.N.Y. 2011) ("In certain circumstances, procedural irregularities may form a basis to infer discriminatory animus or pretext. . . . However, departures from established procedure do not show, without more, that an employer was animated by racial discrimination."  (citations omitted)), aff'd, 469 F. App'x 66 (2d Cir. 2012).

As explained below, there is little, if any, evidence of procedural irregularities in connection with plaintiff's attempt to select a replacement class or with respect to the December 2010 Stipulation.  Moreover, to the extent that any such deviations did occur, none of them are sufficient to suggest pretext or discrimination.

*i. Plaintiff's Attempts to Select a Replacement Class*

Plaintiff argues that the College's denial of plaintiff's contractual "bumping" rights provides further evidence of pretext.  This argument is not persuasive.

In order to consider plaintiff's assertions concerning her "bumping" rights, it is necessary to briefly review the evidence concerning plaintiff's attempts to select a replacement class

In Chin's January 10, 2012 email, which informed plaintiff that her CHE134-101 class was cancelled, Chin directed plaintiff to select replacement classes so that plaintiff would have a full 15-credit schedule.  Chin's email reminded plaintiff of the College's "bumping policy," which states that a "full-time classroom faculty member who has lost a regular day section may select any section in the master schedule (that he/she is qualified to teach) that is either unstaffed or part of an overload or adjunct assignment." (Def. Ex. I (emphasis added).).  College policy also prevents a faculty member whose class has been cancelled cannot create a "whole new schedule."  (Mauk Dep. 37–39.).

According to Chin, on January 12, 2012, plaintiff, through the FA, requested a "light loaded" schedule and requested to teach the Tuesday 8–10:45 AM CHE100-106 class.  (Chin Decl. ¶ 16.)  That same day, Chin emailed Thomas Koetzle, an adjunct professor, to tell him that Chin had to change his teaching schedule because plaintiff has the rights to bump any adjunct. (Ex. F.)  Chin's email implies that Koetzle would no longer be teaching the Tuesday 8-10:45 AM CHE100-106 class, which he was apparently originally assigned.  (Id.)

On January 15, 2012, plaintiff emailed Chin and Sean Tvelia, a union official.  In this email, plaintiff rejected the schedule "proposed on 1/12/2012," stating that it was "unprecedented and can be problematic."  (Pl. Ex. G.)  In the email, plaintiff proposed to instead teach: "General Chemistry – 25489 – CH 100-119 [Monday and Wednesday]" and "College Chemistry II –

24

23682 – CH 134 – 103 [Tuesday and Thursday].”  (Id.)

On January 16, 2012, Chin emailed plaintiff, denying plaintiff's request to teach CHE134-103 because that class was "part of Dr. Brockman's regular load."  (Id.)  Chin also informed plaintiff:  "You've already made your decision on 1/12/2012 to bump Dr. Koetzle's lab (CHE100-106, CRN 21438).  It was not proposed."  (Id.)

Later on January 16, plaintiff responded to Chin requesting a different schedule. Specifically, plaintiff requested:  "College Chemistry – 23680 – Che 133-103 [Monday and Wednesday] (Lecture and Lab)"; "General Chemistry – 21438 – Che 100-106 [Tuesday] Lab"; and "General Chemistry – 21439- Che 100-107 [Thursday] (Lab)."  (Id.)  That same day, Chin responded to plaintiff, telling her that she could not change "CHE100-119 (26489)", scheduled for Monday and Wednesday, because that class had not been cancelled and was part of plaintiff's "original regular load."  (Id.)  Chin maintains, in her declaration, that plaintiff had improperly attempted to change her entire schedule, just before the start of the semester.  (Chin Decl. ¶ 19.)

On January 17, 2012, plaintiff responded that she should be permitted change "CH 100-110" to "College Chemistry – 23680 – CHE 133-103."  (Pl. Ex. G.)  In this email, plaintiff maintained that she could take all three classes that she requested in her January 16 email because those classes were taught by adjuncts.  (Id.)

Later, on January 17, 2012, Chin responded to plaintiff, directing her, again, to "just select a course to replace . . . CHE134-101," the course that had been cancelled.  (Id.)

The next communications in the record concerning plaintiff's schedule are the email exchanges that occurred during the week of Monday January 23. These emails culminated in Chin assigning plaintiff a final schedule on Wednesday January 25 that consisted of CHE100-199 (with class on Monday and Wednesday morning and lab on Monday afternoon); CHE100-

106 (a lab on Tuesday morning at 8 AM); and CHE100-107 (a lab on Thursday morning at 8 AM). These email exchanges have previously been discussed at length, and do not need to be repeated here.

Plaintiff argues that Chin violated plaintiff's bumping rights in three ways during this sequence of events set forth above.

First, plaintiff argues that Chin's January 12 email to Koetzle is evidence that Chin unilaterally selected a replacement for plaintiff and violated her bumping rights. This argument is not persuasive. Chin maintains that, on January 12, 2012, the FA, acting on plaintiff's behalf, requested a schedule for plaintiff that included the CHE100-106 (the Tuesday morning 8 AM lab). In response to that request, Chin told Koetzle that Koetzle would no longer teach this class. Subsequently, on January 15, 2012, plaintiff emailed Chin, rejecting the schedule "proposed on 1/12/2012," stating that it was "unprecedented and can be problematic." (Pl. Ex. G.) There is, however, no evidence in the record suggesting that, on January 12, 2012, when Chin emailed Koetzle, Chin knew that plaintiff had not authorized the FA to request this class for her. Accordingly, Chin's January 12, 2012 email does not suggest that Chin unilaterally sought to select the replacement class for plaintiff, and adds nothing to plaintiff's discrimination claim. Plaintiff has not offered any evidence, such as contrary testimony from the union officials who communicated with Chin, to cast doubt on Chin's asserted belief that the FA was acting on plaintiff's behalf when it proposed a schedule on January 12.

Second, plaintiff argues that there is no evidence that plaintiff attempted to change her entire class schedule. This argument is meritless and is refuted by emails sent by plaintiff on January 16. The schedule proposed in plaintiff's January 16, 2012 emails did not include Chemistry 100-119. However, the schedule that plaintiff originally selected during the round-

26

robin selection included only two courses, Chemistry 100-119 and Chemistry 134-101, the class that was cancelled. (Chen Dep. 62–63.) Accordingly, any proposed schedule that did not include Chemistry 100-119 was, necessarily "entire[ly] different" than plaintiff's original schedule. Because plaintiff's January 16, 2012 request did not include Chemistry 100-119, it was an entirely new schedule and, was, thus, properly rejected by Chin.

Third, plaintiff challenges Chin's January 16 email, which denied plaintiff's request to teach CHE134-103 based on Chin's assertion that this class was "part of Dr. Brockman's regular load."[9] Plaintiff's declaration asserts, in conclusory fashion, that "neither [of plaintiff's two scheduling requests] included a class that was part of a full-time faculty member's regular load." (Chen Decl. ¶ 11.)[10] Plaintiff, however, provides no specifics. Her conclusory assertion is insufficient to raise a factual dispute on this issue. Plaintiff's declaration does not even address the specific class—CHE134-103— discussed in Chin's January 16 email and does not include any specific facts about Dr. Brockman's schedule to support plaintiff's conclusory assertion that her scheduling requests did not include "a class that was part of a full-time faculty member's regular load."

For the reasons set forth above, plaintiff has not offered sufficient evidence from which a jury could conclude that the College violated plaintiff's bumping rights. And, even if a jury

---

[9] Plaintiff's opposition brief argues, in a footnote, that Chris Gherardi, an Associate Dean, testified that full-time faculty members are, in fact, permitted to select a class from the regular loads of more junior full-time faculty members. (Gherardi Dep. 42–43, Pl. Ex. A.) The Court declines to consider this argument, which is merely raised in a footnote. Moreover, Gherardi's testimony, ultimately, does not help plaintiff. In his testimony, Gherardi indicates that in certain circumstances, a more senior full-time faculty member may select a "regular load" course from a more junior full-time faculty member. (Id. at 42.) Gherardi, however, explained that this could only occur after the more senior faculty had first exhausted attempts to select an unstaffed, adjunct, or overload course. (Id.) Thus, contrary to plaintiff's suggestion, Gherardi's testimony does not indicate that full-time professors can immediately select whatever regular load course they wish from a more junior full-time professor. Notably, there is no evidence here that plaintiff had unsuccessfully exhausted all other options before attempting to select a course from Dr. Brockman's regular load.

[10] Despite making this conclusory assertion in her declaration, plaintiff's 56.1 admits, at one point, that "[n]othing in the record indicates whether the class selected by plaintiff in mid-January, 2012, to replace her canceled class was part of Dr. Brockman's regular load or overload." (Pl. 56.1 at 4 (emphasis added).)

27

could conclude that plaintiff's bumping rights were violated in some fashion, such as with Dr. Brockman's class, none of the evidence outlined suggests that the reasons proffered by the College for plaintiff's subsequent suspension were a pretext for discrimination.

   2.  *Alleged Violations of the December 2010 Stipulation.*

   The December 2010 Stipulation includes the following provision:

> The Employee further expressly agrees that it will be in the sole discretion of the College Compliance Officer or designee as mutually agreed upon between the College and the Faculty Association as to whether or not the terms of the Stipulation have been violated and to make a recommendation to the President of the College that the Stipulation has been violated.

(Def. Ex. H ¶ 5.)

   Plaintiff argues that the College breached these procedures in two ways.  The College responds that it complied with the December 2010 Stipulation and that, even if it did not, that would not raise an inference of discrimination given the specific facts of this case.  As explained below, neither of plaintiff's arguments are persuasive.

   First, plaintiff argues that the College breached this stipulation because "[n]othing in the record indicates that the College Compliance Officer (or designee) even investigated Chen's alleged violation of the Stipulation, much less submitted a recommendation to the President." (Pl. Mem. at 23–24.)

   The record does not indicate the identity of the College Compliance Officer.  Nor is there any evidence explicitly stating that Tempera was formally made the "designee" of the College Compliance Officer for purposes of the December 2010 stipulation (or explaining how that designation process worked).  However, it is undisputed that Tempera was Vice President of Employee Resources and was "responsible for oversight with respect to all College personnel issues."    (Tempera Aff. ¶ 3.)    Accordingly, even if Tempera was not formally made the

appropriate "designee," nothing about his role in plaintiff's suspension suggests any impropriety, and certainly not discrimination.

Plaintiff also argues that the record does not indicate that:  (1) a recommendation, from Tempera (or any other official) was made to the President; and (2) "the President ever participated in the decisionmaking process, much less determine[d] that Chen violated College 'rules and procedures.'"  (Pl. Mem. at 23–24.)

Plaintiff's claim that the record is silent on this point is mistaken.  Tempera testified that—although his recommendation to the President may not have been very "involved" and may have occurred orally—any employment actions have to be approved by the President of the College.  (Tempera Dep. 17–19, ECF No. 37-53.)  A jury could not infer, from the record before the Court, that the President failed to participate in the suspension process.  Notably, plaintiff has not pointed to any evidence undermining Tempera's deposition testimony.

Even assuming <u>arguendo</u>, that there are some factual disputes indicating that the College's actions were not in complete conformance with the terms of the December 2010 Stipulation, such evidence does not suggest discrimination here.

It should also be noted that the December 2010 Stipulation is a document that appears to be unique to plaintiff.  It is not a general policy or procedure that is applicable to other faculty members.  Thus, any alleged violation of the December 2010 Stipulation would not indicate that plaintiff was subjected to disparate treatment.  That distinction further supports the Court's conclusion that the alleged violations of the December 2010 Stipulation do not suggest discrimination.

### 6. Consideration of the Record as a Whole

The Second Circuit has made it clear that a "plaintiff's evidence at the third step of the

McDonnell Douglas analysis must be viewed as a whole rather than in a piecemeal fashion."

Walsh v. N.Y. City Hous. Auth., 828 F.3d 70, 76 (2d Cir. 2016).

The Court has considered each of plaintiff's contentions above.[11]  Even when all of these facts are considered together, no reasonable jury could conclude, based on this record, that the College's reason for suspending plaintiff was a pretext for discrimination.  In light of the entire record here, no reasonable jury could infer that plaintiff's age, gender, and/or national origin motivated plaintiff's suspension.

**C.  Retaliation**

Plaintiff contends that the College's observations of her in 2013 and 2014 were in retaliation for the filing of her discrimination charge with the NYSDHR in October 2012.  As explained below, defendant is entitled to summary judgment on plaintiff's retaliation claim.

Before addressing the substance of plaintiff's retaliation, the Court notes that this retaliation claim is procedurally defective in a number of respects.  On that basis alone, summary judgment is warranted.  Plaintiff's complaint never even mentions evaluations conducted in May 2013 and February 2014.  Instead, plaintiff's complaint mentions a single performance evaluation conducted in the fall of 2012.  (Compl. ¶¶ 3, 32.)  Moreover, plaintiff's 56.1 statement fails to squarely raise the 2013 and 2014 evaluations.  The only explicit reference to these two

---

[11]  The Court notes that plaintiff's papers allude to one other potential argument concerning the cancellation of plaintiff's class, but fail to develop that argument in any meaningful fashion.  At the time that plaintiff's class was cancelled, two Organic Chemistry II classes that had 10 and 7 enrolled students, respectively, were not cancelled. (Chin Aff. ¶ 10.)  The College maintains that these two classes were not cancelled because Organic Chemistry II is the final course that chemistry majors must take and is only offered in the spring.  As a result, if these two classes were cancelled, some students would have to wait an entire year for this course to be offered again so that they could graduate.  In her 56.1 Statement and the facts section of her opposition brief, plaintiff asserts that there are certain disputed facts concerning the College's policy for cancelling classes with low enrollment.  Plaintiff, however, never mentions this issue again in the arguments section of her brief.  Accordingly, plaintiff has waived any argument on this issue.  In any event, all of the relevant witnesses acknowledge that, whatever the precise policy is for cancelling classes, classes with low enrollment can still proceed where special circumstances justify keeping  the class on the schedule despite low enrollment.  (See, e.g., Sherwood Dep. 83–84, Pl. Ex. A; Breeden Dep. 104–05.)  There is no evidence that plaintiff's cancelled class involved any special circumstances that warranted keeping it on the schedule despite the low enrollment.

evaluations is found on page 6 of plaintiff's 56.1 statement. Plaintiff's 56.1 statement, however, does not provide any citation to the record to support her factual assertions concerning these evaluations. Instead, the only place where plaintiff cites any record evidence on this issue is in her opposition brief. That is not the proper way to present facts to the Court. As the above discussion makes clear, plaintiff has not properly raised a retaliation claim based on the May 2013 and February 2014 evaluations.

In any event, even assuming that plaintiff has properly raised a retaliation claim based on observations that occurred in May 2013 and February 2014, such a claim fails on the merits.

Both Title VII and the ADEA prohibit retaliation against employees who engage in activity that is protected under those statutes. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). Retaliation claims are analyzed under the essentially same burden-shifting framework as plaintiff's discrimination claims. Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015). To establish a prima facie case of retaliation, plaintiff must demonstrate: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment.'" Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (quoting McMenemy v. City of Rochester, 241 F.3d 279, 282–83 (2d Cir. 2001)). A plaintiff can establish a causal connection either: "'(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant.'" Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)). "After the defendant responds with a non-retaliatory reason for the adverse

employment action, the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." Ya-Chen Chen, 805 F.3d at 70 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013)).

Here, it is undisputed that plaintiff engaged in protected activity by filing a charge with the NYSDHR in November 2012. Defendants, however, argue that the College's observations of plaintiff do not qualify as adverse employment actions and that, even if they did, plaintiff has not offered sufficient evidence for a jury to ultimately infer that plaintiff's observations were conducted in retaliation for her discrimination charge. The Court agrees with defendants.

Plaintiff did not suffer any adverse action after filing her NYSDHR charge. Plaintiff has not offered sufficient facts from which a jury could conclude that the May 2013 and February 2014 evaluations were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).

Moreover, plaintiff's retaliation claims also fail because even if these observations could constitute adverse actions, plaintiff cannot ultimately show that a desire to retaliate against plaintiff for her November 2012 discrimination charge was the but-for cause of her evaluations in 2013 and 2014.

In attempt to show retaliatory animus, plaintiff relies on a portion of Breeden's deposition testimony where he was asked if he was angry with plaintiff for filing the discrimination charge. Breeden answered: "In my opinion they were baseless, so I was annoyed. I wouldn't say I was angry, but I will say I was annoyed." (Breeden Dep. 172.) Plaintiff asserts that, based on this comment, a jury could conclude that Breeden vented his annoyance by subjecting plaintiff to more observations than would otherwise have been scheduled. The Court disagrees. No

32

reasonable jury could reach that conclusion based on the totality of the record.

Critically, on October 16, 2012—before plaintiff filed her discrimination charge— plaintiff was observed after a number of plaintiff's students complained.  (Chin Aff. ¶¶ 23–24.) This fact is ultimately fatal to plaintiff's retaliation claim.

In her opposition brief, plaintiff contends that tenured faculty members are rarely, if ever, observed.  Essentially, plaintiff is arguing that observations of tenured faculty are extraordinary. However, if that is the case, then Breeden had already taken this extraordinary step in October 2012 prior to plaintiff engaging in protected activity.  In light of that fact, a jury could not conclude that the additional observations in 2013 and 2014 were conducted in retaliation for plaintiff engaging in protected activity.  Cf. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.")

Plaintiff also argues that the reasons given by Breeden for plaintiff's observations are not credible.  Breeden testified that, in his department, every complaint about a teacher results in an observation, although not all observations are written up because that is a time-consuming process and the faculty does not "like you to say negative things about them in writing." (Breeden Dep. 28.)  Plaintiff argues that although student complaints are common, Breeden "could identify only a single tenured faculty member (other than Chen) whose teaching had been formally observed."  (Pl. Mem. at 27.)  Plaintiff's argument is not persuasive.  Breeden was asked if he had previously observed another tenured faculty member, and, in response, he identified one professor, Dr. Inglis.  (Breeden Dep. 26–27.)  Breeden, however, was never asked to provide a comprehensive list of all such observations.  Moreover, Breeden stated that he rarely

receives complaints about full-time faculty members.  (Id. at 27.)  Plaintiff offers no evidence to contradict this testimony.  Nor has plaintiff offered any evidence contradicting Breeden's testimony that he does not write up all of his observations.

Relatedly, plaintiff asserts, in her declaration, that before October 2012, "my classroom teaching had never been observed by department administrators because of student complaints regarding my classroom teaching."  (Chen Decl. ¶ 7.)  Plaintiff, however, does not identify any student complaints that were filed against her prior to October 2012.

### III.  CONCLUSION

For the reasons stated above, the Court grants defendants' motion for summary judgment. The Clerk of Court is directed to close this case.

**SO ORDERED.**

| | |
|---|---|
| | ___/s/ JMA_____ |
| Dated:  March 31, 2017 | Joan M. Azrack |
| Central Islip, New York | United States District Judge |